N THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

FILED
OCT - 9 2018
Clerk, U S District Court
District Of Montana
Billings

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. DOUGLAS CAMPBELL RALEIGH, Defendant. | CR 18-27-BLG-SPW  OPINION AND ORDER |

Defendant Douglas Campbell Raleigh is charged with possession with intent to distribute methamphetamine and possession of a firearm in furtherance of a drug trafficking crime. He has moved to suppress the evidence that forms the basis of Counts I and II of the Indictment. (Doc. 19). On October 5, 2018, the Court held an evidentiary hearing on Raleigh's motion. The Court heard from Billings Police Detective Hallam and Billings Police Officer Foster.

Having read and reviewed the parties' submissions and the applicable law, having heard the testimony of the witnesses noted above, and for the reasons stated on the record by the Court, Raleigh's motion to suppress is granted.

I. **Background**

The Court listened to the recording of the anonymous call to dispatch. Ex. D. The following is taken from the dispatch call.

1

On February 1, 2018, at 6:53 p.m., an anonymous caller contacted Billings Police Department's City/County Dispatch and reported that he was at the Grandstand Bar in Billings, Montana. (Doc.22 at :15). He stated he would "rather not" give his name or phone number, but wanted to report that he had run into a "person of interest" wanted for questioning by the Billings Police Department for a "shooting at one of the bars downtown." (*Id.* at :26). The caller said that he did not know the person's real name, but knew that the person went by "KB,"[1] and that "KB" was a drug dealer. (*Id.* at :32). When asked again if he would give his phone number or his name, the caller responded, "Nope." (*Id.* at :54). He said that the police should send a plainclothes officer to investigate so that the "bar don't get shot up." (*Id.* at 1:01).

The dispatch officer asked the caller when the prior bar shooting occurred and the caller said it happened about three months earlier, around the same time KB had shot at him. (*Id.* at 1:20). The caller stated that the police should know who the person of interest was, because "they have been looking for him for a while" and "he was on the front page of the paper." (*Id.* at 1:35). When dispatch asked what KB was wearing, the caller stated that "he didn't really get a good

---

[1] According to the dispatch recording, the caller reported the person of interest went by "KB," however, Detective Hallam and the other arresting officers refer to KB as KD in their reports. (*See e.g.* Doc. 21-1). To avoid confusion, the Court construes all references to KB as references to KD.

2

look," but that KB had "distinctive dreadlocks" and "may or may not have a goatee," was African American, and 6 feet 1 inches tall, 240 pounds. (*Id.* at 2:45-55).

The dispatch officer asked the caller if he knew if KB had any weapons on him, the caller responded, "he shot at me before." (*Id.* at 1:02). The dispatch officer asked again if the caller knew if KB had any weapons on him, the caller said, "I don't know tonight . . . I didn't walk up and talk to the guy, he shot at me three months ago." (*Id.* at 1:13). When dispatch asked the caller if he knew what type of weapon KB typically possessed, the caller responded, "nope." (*Id.* at 3:55). He said KB shot at him with a pistol, which he assumed was a revolver because "when they came to see they couldn't find the shell casings." (*Id.* at 4:00). Dispatch asked if the caller knew if KB typically carried weapons, the caller responded, "he has shot at people before and he's a drug dealer. I don't know the guy." (*Id.* at 4:11-21).

After providing a description of KB, the caller reported that he thought KB was leaving so dispatch "should forget it." Dispatch asked if he had seen any vehicles leave the parking lot and the caller responded, "he could be out there doing drugs, I haven't seen him leave yet." (Doc. 4:30-4:45). After providing a description of the parking lot where KB was located, he stated that he saw KB talking to a brunette with long hair outside of a four door sedan. (*Id.* at 6:25-6:35).

3

After a couple minutes of silence, dispatch asks if the caller can see KB. (*Id.* at 8:49-52). The caller states that he can't "put eyes on him without being too obvious." (*Id.* at 8:53-57). He stated that he knew for a fact "from asking around" that KB "deals in cocaine and meth." (*Id.* at 9:19-23).

After hearing sirens, the caller described his incident with KB and said that he chased him out of the bar and chased him with his truck, and that if KB heard the sirens he would run. (*Id.* at 9:53-10:13). He stated at that time KB shot at him, KB was driving a white Honda Pilot. (*Id.* at 10:21-23). The caller then advises dispatch that the police need to come around from the rear so that KB cannot see them coming. (*Id.* at 10:55-11). The caller continues to report KB standing in the parking lot and then states, "they got him." (*Id.* at 12:50-58). Dispatch confirms that the "officers are with him" the caller responds, "yep," and dispatch ends the call. (*Id.* at 13:00-05).

While dispatch was talking to the caller, dispatch was also communicating with the Billings Police Department. At 1:40 seconds into the recording, dispatch advised officers of a suspicious person at the Grand Stand Casino. Specifically, dispatch states, "complainant states that a suspect in a bar shooting, there now, gave the name of "KB," kilo bravo, doesn't see any weapons but suspect may shoot the place if he sees a uniformed officer." (Doc. 44 at 1:25-47).

4

The officer requests that dispatch look up a shooting at "Bones," a bar in Billings, on November 17 or 18. (*Id.* at 2:40). Dispatch responds that she found the call related to Bones and she lists off the names of the individuals involved, none of whom had the initials or names of "KB." (*Id.* at 3:25-3:40). Another officer states that the only bar shooting was the Bones shooting and "Kruger might have found everyone associated with that." (*Id.* at 3:41-3:52). Another officer states, "yeah, that's the only one I could think of, but thank you." (*Id.* at 3:52-53).

One officer asked if "KB means anything to you" and the other officer stated he would give Sergeant Finnegan a call. (*Id.* at 4:01-08). Dispatch advised at that point that the suspect was still in the parking lot next to a red Ford pickup. An officer stated that units are going to the bar and they do need to have "KD" identified. (*Id.* at 5:10-12). Shortly thereafter, Sergeant Finnegan reported that "KB is not the shooter but he is a witness that Kruger still needs to get a hold of." (*Id.* at 5:28-31)(Doc. 21-1 at 1). Officer Foster and Detective Hallam parked behind the Grand Stand Casino and across the street from the Casino. (Doc. 21-1 at 2). Detective Hallam states that he sees a red Ford Crewcab pickup in the Grand Stand Casino parking lot.

Dispatch advises the officers that the suspect's vehicle is not the red Ford pickup, but is parked next to it. (*Id.* at 8:30-57). Dispatch states that the complainant was not able to give a description of the suspect's vehicle other than

5

that it was a sedan. (*Id.* at 8:59-9:01). Dispatch provides the suspect's description as a 25 year old black male 6'1, 240 pounds, long hair in dreadlocks and goatee talking to a brunette female. (*Id.* at 9:02-08). Detective Hallam drives through the parking lot in an unmarked car and confirms he sees a black male east of the pickup talking to a female. (*Id.* at 10:48-53); (Doc. 21-1 at 1). He advises that he was going to park in the back and walk in on foot. (*Id.* at 10:48-53); (Doc. 21-1 at 2). Detective Hallam asked dispatch if the suspect was supposed to be wearing a hoody. (*Id.* at 11:25-30). Dispatch replied, "no clothing description." (*Id.*). Detective Hallam reported he was "going now." (*Id.* at 11:42-44). Dispatch then states, "affirm, dark colored hoody." (*Id.* at 11:46-48).

According to Detective Hallam's report, he drew his weapon and identified himself and told Raleigh to put his hands in the air. (Doc. 21-1 at 2). Raleigh turned and faced him, but did not immediately comply. (*Id.*). After two more requests, and as patrol officers began converging in the parking lot, Raleigh put his hands up and an officer handcuffed him. (*Id.*).

Detective Hallam asked Raleigh where his gun was and Raleigh looked at his right side waist band area and said, "right here." (*Id.*). After the gun was removed, Detective Hallam confirmed that Raleigh did not have a concealed weapons permit. (*Id.*). When Hallam asked Raleigh if he was a convicted felon, Raleigh responded "yes." (*Id.*). Hallam advised Raleigh of his Miranda rights.

Raleigh agreed to speak with Hallam and told him that drugs were located in his pocket. (*Id.* at 3). Hallam also removed wads of cash, an identification card, hotel room keys and a Kia car key from Raleigh's pockets. (*Id.*). Raleigh's identification card identified him as Douglas Raleigh. Dispatch advised that Raleigh had an outstanding arrest warrant and a DOC hold warrant. (*Id.*).

Officers found the KIA which matched the key found on Raleigh in the parking lot of the Casino. Search warrants were prepared for the hotel room and the KIA. On February 1, 2018, Montana State District Court Judge Todd issued a warrant to search the hotel room. Nothing was located in the hotel room. The next day, Judge Todd issued a warrant to search the KIA. Officers located large quantities of money and drugs, and a firearm. Raleigh moves to suppress all of the evidence as fruit of an illegal seizure.

## II. Discussion

Raleigh argues that the officers did not have the requisite reasonable suspicion to stop him in the Grand Stand Casino parking lot. He challenges officers' reliance on the complainant's tip and claims that they failed to sufficiently corroborate any report of suspicious activity. Because the search of the Kia flowed from the investigatory stop, Raleigh argues that the evidence is "fruit of the poisonous tree" and should also be suppressed. The government opposes the motion and contends that the tip in this case provided sufficient reasonable

7

suspicion to stop Raleigh in the parking lot, so the seizure and search complied with the Fourth Amendment.

A. **The officers lacked reasonable suspicion to conduct the *Terry* stop of Raleigh**

Because a Fourth Amendment seizure occurred when the officers surrounded Raleigh with their guns drawn, at that point the officers needed reasonable suspicion that criminal activity was "afoot" for the seizure to be lawful. *Terry*, 392 U.S. at 30. Whether reasonable suspicion exists depends on the totality of the circumstances, including both the "content of the information possessed by the police and its degree of reliability." *Alabama v. White,* 496 U.S. 325 330 (1990). The information that courts evaluate is that which is known to law enforcement officers at the time of the Fourth Amendment event at issue. *Moreno v. Baca,* 431 F.3d 633, 639 (9th Cir. 2005). In this case, when the officers stopped Raleigh, the only information known to them consisted of (1) the anonymous tip; (2) KB (or KD) was a witness that Sergeant Kruger wanted to question regarding the Bones shooting; and (3) Raleigh's location. This information did not provide reasonable suspicion to justify stopping Raleigh under the Fourth Amendment.

It is well settled that an officer's subjective intent in making a stop is not dispositive of the question of whether the stop is constitutional. *United States v. Morales,* 252 F.3d 1070, 1074 (9th Cir. 2001) (citing *Whren v. United States,* 517

8

U.S. 806, 813 (1996). As long as there is an objectively reasonable basis, a stop is permitted under the Fourth Amendment. *Id.* So, if a tip objectively establishes reasonable suspicion that Raleigh was engaging in criminal activity, the stop was constitutional.

An anonymous tip standing alone does not demonstrate an informant's veracity or reliability because the anonymous tipster cannot be held accountable if he lies or is inaccurate, and the police cannot assess his reputation. *See Florida v. J.L.*, 529 U.S. 266, 270 (2000). Something more than the anonymous tip alone is required to establish reasonable suspicion that criminal activity is afoot. *Id.* "In order for an anonymous tip to have sufficient indicia of reliability to serve as the basis for a *Terry* stop, the tip must include a range of details, and it must predict future actions by the suspect that are subsequently corroborated by the police." *Id.* at 1074-75 (quoting *Alabama v. White*, 496 U.S. 325, 328 (1990)) (internal quotations omitted). "Mere confirmation of innocent static details in an anonymous tip does not constitute corroboration." *United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994).

Two Supreme Court cases illustrate the information required to establish reasonable suspicion with an anonymous tip. In *Illinois v. Gates*, the police received an anonymous letter stating that a married couple sold drugs. The letter described the drug operation in detail and predicted that the wife would drive the

drugs to Florida and the husband would fly to Florida to pick up the car. Subsequent police observation confirmed most of the letter's predictions. The Court held that while the letter itself did not provide any information as to the tipster's reliability, the Court considered the tip reliable under the totality of the circumstances because independent police observation confirmed almost all of the details the tipster provided. (*Id.* at 244).

Similarly, in *White*, the police received an anonymous tip that a woman would be leaving 235-C Lynwood Terrace Apartments at a certain time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of an ounce of cocaine inside a brown leather case. 496 U.S. at 327. After observing a woman leave the 235 building, get into a brown Plymouth with a broken right taillight, and drive to Dobey's Motel, the police stopped the car and asked if they could search it. She consented and they discovered cocaine in her brown case.

The Court held that while the tip standing alone was insufficient to establish reasonable suspicion that the woman was engaged in criminal activity, reasonable suspicion nonetheless existed because the police were able to sufficiently corroborate the tip by corroborating the predictions contained in the tip. *Id.* at 331. Important to the court's analysis was that the tip not only provided an accurate range of details but also related to the "future actions of third parties not easily

predicted." *Id.* at 332. *Cf. Florida v. J.L.*, 529 U.S. 266 (2000) (anonymous tip that a young black male, standing at a particular bus stop and wearing a plaid shirt, was carrying a gun, contained no predictive information and was thus insufficient to establish reasonable suspicion for a stop because apart from the tip, the police had no reason to believe he was engaged in criminal activity.).

Based on the above Supreme Court cases, the Ninth Circuit determined that in order for an anonymous tip to serve as the basis for reasonable suspicion: (1) the tip must include a "range of details;" (2) the tip cannot simply describe easily observed facts and conditions, but must predict the suspect's future movements; and (3) the future movements must be corroborated by independent police observation. *Morales*, 252 F.3d at 1076.

After *Morales*, however, the Supreme Court broadened the circumstances under which law enforcement may use an anonymous tip from a 911 caller. In *Navarette v. California*, 572 U.S. 393 (2014), the Supreme Court held that a detailed, contemporaneous report of suspicious activity to a 911 emergency dispatcher carries with it sufficient indicia of reliability when the details and the location of the described event turns out to be correct. *Id.* at 399-401.

There, a woman called 911 and stated that a truck had run her off the road, described the truck and license plate number, and provided the location where the incident occurred. Officers responded to the location and located a truck matching

the description within ten minutes of the dispatch, and pulled the truck over to determine whether the driver was intoxicated. *Id.* at 399-400. The Court held that "by reporting that she had been run off the road by a specific vehicle . . . the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving. That basis of knowledge lends significant support to the tip's reliability. *Id.* The Court concluded that the totality of the circumstances provided reasonable suspicion to stop the truck because the police located the truck shortly after the 911 call in the same area where the driver reported she had been run off the road. *Id.* The Court reasoned "[t]hat sort of contemporaneous report has long been treated as especially reliable" and noted that "the stress of excitement caused by a startling event" also weighed in favor of the caller's veracity. *Id.*

In this case, the anonymous tip's "range of details" included details about a person he believed was "KB," KB's physical appearance and his location, that he was allegedly involved in a shooting at a local bar three months prior, that he was previously involved in a shootout with the caller three months prior, that he was on the front page of the paper, and that he was a drug dealer. Although the tip could be tortured into allegedly predicting KB's future movements; that he would "shoot up the place," run from the police, and possibly do drugs in the parking lot, there was no corroboration of any of these aspects of the tip. No officer observed Raleigh with any weapons or doing drugs, or making any movements that would

12

indicate drug activity prior to the stop. The caller did not describe observing any criminal activity by Raleigh during the call to dispatch.

Notably, the officers did not even identify Raleigh as being KB (or KD) prior to the stop. So, the officers did not know whether the information the caller provided about KB even applied to the male they observed in the Grand Stand Casino parking lot.

The officers identified the vehicle next to where Raleigh was standing, and confirmed they saw him standing in a parking lot talking to a woman. Otherwise, the tip provided some uncorroborated historical information, easily observable facts and conditions, and zero predictive information.

## II. Conclusion

Officers did not have reasonable suspicion to stop Raleigh, so the stop violated Raleigh's Fourth Amendment rights. Accordingly, all evidence seized as a result of the stop and the evidence seized from the Kia Sorento should be suppressed. *Wong Sun v. United States*, 371 U.S. 471 (1963).

DATED this 9th day of October 2018.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge